Good morning, Your Honor. May it please the Court, Craig Stewart for the appellants. I intend to reserve five minutes for my rebuttal. In Tranko, the Supreme Court held as a general rule, failing to render sufficient assistance to rivals is not a valid antitrust claim. The question in this case is whether that same principle applies when the alleged insufficient assistance takes the form of a price squeeze. We submit that it does for two fundamental reasons. First, price squeeze claims cannot meaningfully be distinguished from any other claim that a competitor failed to deal with its rivals on terms that would allow those rivals to make a profit. And second, the reasons the Supreme Court gave in Tranko for limiting refusal to deal liability apply equally whether the price — whether the refusal to deal takes the form of insufficient price terms as opposed to any other price terms. Let me turn to the first point. A price squeeze claim is at its core a claim that the defendant imposed extra costs on its rivals that prevented the rivals from profitably competing against the defendant in a downstream market. And that is precisely the circumstance that Tranko addressed. In that case, the allegation — excuse me — the allegation was that the phone company, Verizon, had refused to deal with its rivals on terms at a — at the wholesale level, the provision to them of loops and other network elements that would allow those rivals to compete at the retail level for sales to end-user consumers, a telephone service with Verizon. In both cases, the plaintiff was a purchaser from the defendant at the wholesale level and a competitor at the retail level. And in both cases, the claim was that the defendant had a duty to deal with its rivals at the wholesale level on terms that allowed the plaintiff to compete at the retail level. The only difference between the two cases is that in one case, the alleged inadequate term was a price term, and in the other case, it was a series of non-price terms. But that one distinction carries no significance. Either way, it's a claim that the defendant had a duty to deal — not only to deal with its rivals, but to deal with its rivals on terms that would allow the rival to compete. This is the claim that Tranko held. It was not a valid claim under the antitrust laws in the absence of a prior voluntary course of dealing, either with the plaintiff or with others, as to the same product or the same service. The retail market is not regulated, you would agree. That's correct, Your Honor. So to the extent that the claim is that there's predatory retail pricing, why does Tranko apply? If the question was simply had the defendants engaged in predatory pricing at the retail level, then Brook Group would govern that. The allegation would have to be that the pricing was below a relevant measure of cost and there was a dangerous probability of recoupment. That's not the claim plaintiffs are seeking to do. Isn't that the allegation, though, in their price squeeze claim, that you — that SBC was selling it at such a low price that it effectively would not allow Linkline to compete at the retail level, and there was a dangerous probability of SBC recouping that once it — it squeezed out all the competitors? Their — their primary claim, Your Honor, on Peel and the claim that was — that was the ad issue and the order that's been certified was the viability of a price squeeze claim. And in their brief at page 24, the plaintiffs concede that if that price — if this Court rules that the price squeeze claim is barred by Tranko, there's no further claim to be addressed. That is the claim they are seeking to pursue. They have, picking up on the Eleventh Circuit's ruling about predatory pricing claims, they have included in their brief some argument about predatory pricing. But — but the issue on Peel and the — and the reason we are here is to address the district court's ruling on price squeeze, which was the only ruling that has been certified. So I — I guess the national — Counsel, am I — am I correct that an issue of predatory pricing at retail isn't a certified issue right now? It's not, Your Honor. That was the subject of the Court's April 2005 order. Also, does the record show us what the market power is of your client at the retail level? Can they — because there's cable companies out there, too. Exactly, Your Honor. The — the allegation in the complaint — and admittedly, we are here on a motion to dismiss, so those allegations were taken as true for purposes of — of this motion and this argument. But as we point out in our brief, the allegation in the complaint that — that the market is just DSL and doesn't include cable is contradicted by the FCC, by other court decisions, and frankly, by common sense. But our argument does not depend on the Court resolving that market definition issue in our favor. For purposes of the motion to dismiss, we were willing to assume that the market is limited to DSL, just as in Trenko, that the market there was limited to the telephone service. And nonetheless, the Court in Trenko ruled that there was no refusal to deal liability. Returning to the second point that — why the analysis in Trenko should be held governing here, Trenko relied on three policy reasons, three principal policy reasons for the Court's unwillingness to impose a general duty to deal. The first is that imposing such a duty chills the incentive of companies to invest in infrastructure and in the ability to provide services, which is contrary to the goals of the antitrust laws. Second, imposing such a duty places the courts in the role of central planners, requiring them to identify the terms of price and quantity and other terms of dealing. And finally, the Court said that forced sharing risks collusion among the competitors. Now, none of these considerations is limited to a refusal to deal on non-price terms. They all apply equally where the allegation is that the price terms were inadequate. And I might note, Your Honors, that the — this Court in the Metronet case applied Trenko to a situation in which the allegation was insufficient pricing. It was not a price squeeze claim in that case, but it was nonetheless an allegation that the price terms that Quest was selling out were inadequate to allow Metronet to compete. So to reach your position, do we have to say that Trenko overruled the City of Anaheim? No, Your Honor, for two reasons. Well, for one reason, I guess. In Anaheim, the Court's actual holding was to reject the price squeeze claim there. The Court held that specific intent is required and that there was no allegation there of specific intent. So the actual holding was not to endorse price squeeze, but, in fact, to reject it. Beyond that, it is — City of Anaheim was, of course, decided before Trenko, and even, excuse me, before Trenko, it's not clear from the Court's opinion whether the defendant's dealings there were compelled by statute. And if they weren't, then there might be room under the Aspen skiing type analysis to impose price squeeze liability. I should emphasize that, contrary to the assumption of the district court, our argument is not that Trenko wiped out all price squeeze claims. We agree with the position of our amicus horizon that, in fact, price squeeze liability is inconsistent with the Court's more recent decisions in the antitrust sphere, including Brook Group and Trenko itself. But our position doesn't depend on that. Our point is simply that, under Trenko, price squeeze claims must be evaluated in the same manner as all other refusal-to-deal liabilities. Where do you get language in Trenko that says that? Because Trenko is really careful to talk about its being a refusal to deal where, absent the statutory regulations, there would be no obligation to deal at all. And it's really a rather narrowly written decision. Well, and our point, Your Honor, is that our case is exactly like Trenko. There is no dispute that the dealings of the defendants here with the Internet service providers were all compelled by statute. What about at the retail level? What regulation is there at the retail level? There is none in this case, Your Honor. There is none? There is no regulation of the price of the Internet access service to end-user consumers. But I should note that the – Trenko did not depend upon the existence of regulation at both levels of the market. The reasons that Trenko gave for not imposing refusal-to-deal liability was that Verizon was compelled by statute in its dealings with the plaintiff at the wholesale level. Right. And that's all it was really talking about, right, was at the wholesale level. And it was an insufficiency at the wholesale level. And what the Court said was, that is so regulated. I mean, look, we already even have a consent degree. And, you know, and as Justice Stevens points out, you know, perhaps there wasn't even standing here, because this isn't even the – I mean, the consent degree dealt with the competition at the wholesale level. If you read the Court's analysis in Trenko, you see that the Court laid out these three reasons that I've just rehearsed for why there's a general reluctance to impose refusal-to-deal liability. And on the basis of those reasons, and on the basis that the dealings with the plaintiffs in that case at the wholesale level had been compelled, the Court found that failing to render insufficient assistance to rivals was not a valid antitrust claim. The Court then went on to note that the regulatory scheme at issue there was a further reason for the lack of need for antitrust invention. And we submit that that additional policy reason, which was an additional reason, and I think the Court would have reached the same result even absent that, but that additional policy reason applies equally here. The wholesale – this is a pervasively regulated market, or at least it was during the time period. The – not only are the defendants obligated to sell DSL transport at wholesale to ISPs, they are obligated to sell unbundled network elements to competing local exchange carriers known as CLECs. You can – you can say the words. It's easier. Absolutely, Your Honor. So they're obligated to sell to competing carriers, COVAD being one of them. COVAD was a plaintiff in a couple of the cases discussed in the briefs. They were obligated to sell network elements to COVAD so that COVAD could combine those elements into DSL transport. So the defendants compete with COVAD at the wholesale level, and then they compete with the ISPs at the retail level. Now, the reason that's important is that the competing carriers like COVAD bring – have brought claims against telephone companies alleging that they have been price-squeezed because the price for DSL transport is too low, and they can't make a profit given the low price that they – the low price for DSL transport as compared to the price they have to pay for the unbundled network elements. So the – so the COVADs of the world want low DSL prices, and the ISPs in this case, they want relatively higher DSL prices. I mean, they might say, well, or we could raise the retail prices. But that, of course, is fundamentally inconsistent with the purpose of the antitrust laws, which is to produce low prices to consumers. So we have this situation where we are subject to conflicting obligations, all with respect to dealings that are compelled by statute. We are compelled to sell to the COVADs of the world the unbundled network elements. We are compelled to sell DSL transport to the ISPs. And it's these statutory obligations that put us in this position. The cable companies aren't being sued. The cable companies aren't a defendant in this case because they're not compelled by statute to deal with the ISPs. They act as their own ISP. But we are, because we're the incumbent telephone company, subject to these statutory duties. So this case is just like Trinco, where the Supreme Court pointed out that not only did Trinco's case differ from Aspen's scheme because the dealings were compelled by statute, but it differed in a more fundamental way from Aspen's scheme, which is that the de Vriesen there was not in the business of selling at wholesale. It was compelled to do so only by the statute. These services, as the Court said, existed only within the bowels of the telephone company. And to bring them out and sell them at wholesale involved the creation of new processes and procedures that would otherwise not exist. That is precisely the situation in our case. Even before DSL was even in existence, the FCC had required that for these types of enhanced services, the phone companies have to provide that to competing carriers. And then when DSL came out, the FCC made it clear that that obligation would apply to DSL, including to the defendants here. So we have precisely the same situation that was present in Trinco, and for the same reasons in Trinco that the Court held that there was no refusal-to-deal liability there, there is no refusal-to-deal liability here. And if I might, Your Honor, I'd like to use the rest of my time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Maxwell Bleacher for the Plaintiff Appellees. First, it's not exactly clear, I think, from this discussion what's been certified. I think clearly what's been certified is whether Trinco obliterates this price squeeze case. There is also a footnote that Judge Wilson inserted in his second opinion, which is at ER-103, which seems to carry the certification, at least in his mind, one step further, and that is whether an ordinary price squeeze would be obliterated by Trinco, but whether one which has a low-cost pricing element to it under Brooke would be obliterated. But I think the main issue here is whether Trinco obliterates this price squeeze case. And to understand that, I think we have to take a step back and look at what Trinco or what the factual predicate of Trinco was and what it actually decided. In Trinco, the plaintiffs came along and said that the obligations which were imposed on incumbent local exchange carriers, local telephone companies, to turn over their networks to newly created competitive local exchange carriers, to create competition at the local level in telephone, in the telephone industry, the question was whether those obligations could be lifted, transferred out of the Telecommunications Act of 1996, and become antitrust duties to formulate a predicate for a refusal to deal claim under Section 2. The Supreme Court said the answer to that was no. The Supreme Court said that only preexisting or traditional refusal to deal cases can survive, and you can't create an obligation to deal by a new statutory framework that didn't exist before. So now the question is, in the first instance, is a price squeeze claim a, quote, traditional or preexisting claim that comes within the refusal to deal or antitrust precedent? The answer is, plainly it is. One need only look at footnote 27 in Judge Wilson's opinion, which is at ER 52, to see the list of cases that he collects on price squeezes, significantly every one of which except for Anaheim, every one of which, including the seminal decision on price squeeze by Judge Learned Hand in the Alcoa case, precede Aspen. So price squeeze was a traditional or preexisting violation of the antitrust list even before Aspen was decided in 1985 by the Supreme Court. Of the cases he's collected, only Anaheim was later than Aspen, and Anaheim was lost not because of the refusal to deal, not because of any legal issue, it was lost because the court below and this court found that the refusal was reasonable because if Anaheim had been able to share directly in the low-cost power from Southern California Edison's customers would have had to pay a higher price. And the court said the protection of the larger group of Edison customers was a reasonable refusal. So the case other than affirming the legal proposition that refusals to deal are antitrust, excuse me, price squeezes are antitrust violations, and affirming the notion that the fact that one of the prices in the price squeeze is regulated is irrelevant. And I called to the court's attention that this court in its most recent discussion of this subject in Metronet said, even in the presence of such a regulatory scheme, a plaintiff may be able to pursue an antitrust claim based on existing antitrust standards and it cites to the 11th Circuit decision in COVAD, which is the predicate on which Judge Wilson relied to say that a price squeeze case was a different breed of cat, a different animal, than a mere refusal. And he explains that in great detail, in my view, explains it better than even the 11th Circuit in COVAD or the District of Columbia Circuit, which rejected that argument. So we have a split in the circuits. He does a better job of explaining that in the record of ER 49 and 50. And here's what he says in substance. He says there can be a refusal to deal anywhere. It's not a situation that's fact-constrained. But there can only be a price squeeze in two situations where the defendant has an upstream monopoly and it sells both at retail and wholesale. So he finds that the setting in which price squeeze can exist is factually constrained and different from a mere refusal to deal. And therefore, he says, SBC's argument that conflates, that's his word, conflates the refusal of the price squeeze does not hold up under scrutiny. He said they're fundamentally different claims, although I would concede to you they're probably second or third cousins, because involved in the price squeeze ultimately is the inability of the plaintiff to compete, which is the essential claim you make under a refusal to deal case. So what I'm saying is, Trinco, in the Trinco case, the plaintiff's claim rested on the defendant's alleged obligation to comply with the Telecommunications Act and make its network available to competitors. We're not under the Telecommunications Act. DSL isn't regulated by the Telecommunications Act. That's not our case. This is a price squeeze case. And Trinco was not a price squeeze case. The 11th Circuit pointed that out in the COVAD decision. And Judge Wilson points it out. This is not a price squeeze case. There is no, there was no, I mean, Trinco was not a price squeeze case. There was no allegation of price squeeze in Trinco, and absolutely no discussion of price squeeze. So if you take a step back and look at the acute factual differences between the allegations in Trinco and the allegations of a price squeeze, we should conclude, as the 11th Circuit and the COVAD, this is a different antitrust violation that clearly is pre-existing or traditional in the sense that it existed even before Aspen's so-called duty to help competitor case came along. Now, against the possibility that you may not see it that way, that you may say, okay, Trinco does cover all the refusals to deal, whether they're accomplished by price squeeze or otherwise, we then, you then need to raise a second question. Obviously, if you decide this case is not governed by Trinco because that was not a price squeeze case, that's the end of, in my view, that's the end of your responsibility. That's the question that's been certified. On the other hand, if you say, well, Trinco might apply here, let's analyze and see what it does. Now, what Trinco did, because the plaintiff said, look, the classic refusal to deal case is now Aspen. Aspen says you have a duty to deal with your competitors and to avoid running them out of business. That's the way at least the bar and some of the accommodations interpreted Aspen. The Supreme Court placed limitations on Aspen. And what it said was, in order to come within the penumbra of Aspen, which it described as the outer limits of the refusal to deal case under Section 2 of the Sherman Act, in order to come within that penumbra, you have to look at three things. I want to emphasize to you that they did not say all three things had to be present, nor did this Court in Metronet say all three things have to be present. Both cases, the Supreme Court in Trinco and this Court in Metronet, said only that these are the three things you look at. One is the dealing between the plaintiff and defendant voluntary. In this case, the answer to that is no. It's compelled. So we lose on that issue. But we still have two other questions, and we're going to win on both of those. Here, exactly as in Aspen, the question was, could you draw an anticompetitive intent from the fact that the defendant sells that retail at one price but won't offer that price to its competitor? The Aspen Court said you can draw an anticompetitive intent from that. Metronet said you can draw an anticompetitive inference from that. But in Metronet, the defendant actually did sell to the plaintiff at the retail price, so it was a non-issue. Here, our contention is exactly that we should be getting the retail price. So here, we're exactly identical with Aspen in the refusal of the defendant to sell at a plaintiff at the retail price. The third issue that Trinco slash Metronet said you have to look at is, whether or not the product or service was in play in the market prior to the claim by the plaintiff that it had an entitlement to participate in that. And the answer here is clearly yes. They were selling DSL, both at wholesale and at retail, before we made a demand on them that they sell it to us at the same price as retail. So if you keep score, and you look at the factors Trinco slash Metronet said you need to look at, we win on two of the three. And neither case, I submit to you and emphasize again, neither case said all three elements had to be present. So it is not correct, in our view. The mere fact that this is a compelled dealing automatically disqualifies us. And that was not true in other cases that Judge Wilson cited in footnote 27, page 52. Because many of those were also regulated cases in which one level of dealing was compelled. So at the end of the day, excuse me, I say to you, it's not covered, this case isn't covered by Trinco, and it shouldn't trouble you to affirm. Or even if you wanted to take a more extreme view and say it's covered by Trinco and its interpretation of Aspen, we satisfy two of the three Trinco, Aspen, Metronet elements. And therefore, it should also be affirmed even under that analysis. Finally, there is a second decision, which Judge Wilson didn't certify exactly, but he has a footnote in there that raises the question. And that issue is the extent to which the price squeeze claim in this case requires a showing of below-cost pricing. Now, I don't think that issue is actually certified, although again, if you look at ER 103 in the footnote, Judge Wilson seems to think it may be. But at the end of the day, let me just say this about the below-cost pricing. Judge Wilson said, following COVID in the 11th Circuit, that we had to allege below-cost pricing, and we did. And in the second opinion, in ER 72 to 104, it's quite a lengthy discussion. Judge Wilson analyzes the complaint and concludes at the end of the day that we have satisfied under 12B6 the requirements that Brooke imposes on any trust plaintiff, namely that the price, some price be below a quote, appropriate, whatever that means, measure of cost, and that there be a possibility of recoupment. He says we've alleged that and makes that conclusion. Then he said, because we argued with him, and I'm prepared to argue with you, that the requirement of below-cost pricing in a price squeeze case is wholly inappropriate, and none of the cases in footnote 27 turn on below-cost pricing. This is a requirement the 11th Circuit engrafted upon the price squeeze case in deference to the Supreme Court's decision in Brooke v. Brown v. Williamson. Now, the reason we think that is superfluous to the Supreme Court's decision is because in this case, the price, the wholesale price, is greater than the retail price. The wholesale price is greater. It's not just that there's a modest difference and we have trouble competing. We're just out of the game completely, because our price is higher than the price we have to ultimately sell to customers. And if you look at the antitrust law developments, it has a statement in there that says, when the wholesale price is greater than the retail price, an illegal price squeeze is presumed. And that's in Antitrust Law Developments, 2002, which is the latest bound volume, at page 271, and it cites to the Third Circuit decision in Bongiorno v. Kaiser Aluminum, and that's the leadoff case that Judge Wilson cites to support the notion that price squeezes are traditional and preexisting antitrust violations and that Trinco and Aspen do not govern them. Now, it's also supported, if you look, by Anaheim and Mishawaka, because in those cases, Mishawaka was the classical electrical, the seminal electrical price squeeze, and Anaheim was the last of the price squeeze cases in the electrical industry, at least that we're aware of, and neither of those cases talked about a requirement that it be below cost. So, one, I don't think below cost is an element of a price squeeze case, whereas here the wholesale price is higher than the retail price. But if it is, Judge Wilson says we've properly alleged it, and then we'll need to go back and litigate what the appropriate measure of cost is at some future time. Thank you, counsel. Thank you very much. Counsel made primarily three points. I'd like to address them in order. The first was that Trinco doesn't apply here because this is a preexisting claim, and that all that Trinco was addressing was whether violations of the Telecommunications Act could support an antitrust claim. In fact, what the Supreme Court did in Trinco is it held violations of the Telecommunications Act do not support an antitrust claim, but we still have to evaluate it under preexisting antitrust standards. And then in a separate holding, the Court went on to perform just that analysis and, in doing so, laid out the standards that govern refusal-to-deal claims. So it's not simply enough to say that before Trinco there were other courts, Supreme Court or lower courts, that had articulated a given theory of liability under the antitrust laws. We have to evaluate those claims, those theories, under the standards that Trinco announced. And I think it's telling that in counsel's argument, he didn't offer any reason why price squeeze claims should be evaluated differently from other claims of insufficient citizens' derivals. I guess the only thing that he offered was that these are the interplay between two different markets, but that was precisely what was at issue in Trinco. There was an alleged monopoly at the wholesale level, an alleged refusal to deal with competitors at that level that, on terms that would allow them to compete at the retail level, and that is precisely the situation we have here with this alleged price squeeze, and that, in fact, is what the D.C. Circuit held when it rejected a price squeeze claim under Trinco. Counsel also referred to regulation, and as I pointed out in my opening argument, our point is not that the regulation precludes price squeeze claims, that you could never have a price squeeze claim in a regulated market. Our point is that under Trinco, where the dealings with the plaintiff are compelled by statute and relate to a product that is not otherwise voluntarily sold in the market, that the predicate for refusal to deal liability is absent. The existence of regulation is a further reason for not imposing a liability. And I should point out again that here we have regulation, a pervasively regulated industry. There is no regulation at the retail level, but the reason for that is, unlike in the telephone context, the SEC has found that there's no need for regulation at the retail level because there's competition at that level. Counsel's second category of points related to Aspen Skiing, and his point was that Aspen Skiing identified three reasons for not imposing liability there, and he argues that two of those don't apply here. The Eleventh Circuit in the COVAD case and the leading antitrust commentators, as we've cited in our brief, have stated that Trinco really makes a voluntary prior course of dealing the prerequisite to imposing refusable deal liability. And we've explained in our brief the reason why we believe that's true. But let's take for purposes of argument as true counsel's point that maybe even in the case of Aspen Skiing, there is some basis for imposing liability. He pointed to the willingness of the defendant to sell to non-competitors, but then refusing to sell to competitors at the same terms. And really his third point was essentially the same thing, that the service at issue is already in play in the market. In other words, you're selling it to non-rivals, but you're refusing to sell that to your competitors. In fact, here, there are two products, and he's conflating the two. There is DSL Transport, which is a wholesale product, which is different from, involves different cost structures, different revenue streams from the retail product. And the retail product is DSL Internet Access Service, which is sold to end-user consumers. There is no allegation that the defendants have refused to sell that retail product to the ISBs or anybody else who's willing to buy it on the terms that the retail product is sold. So there is no allegation in this case, and, of course, it wouldn't make sense that they would want to buy the retail product. This is, therefore, completely unlike Aspen Skiing, where the defendant, the ski company, was in the business of selling lift tickets, and it would sell it to anybody, but refused to sell it to its competitor. That is not the situation here. There are two different products. The — and there is no course of dealing, and there is no sort of play in the market, as counsel referred to, with respect to DSL, aside DSL Transport, the wholesale product, aside from that which is compelled by statute, which brings us squarely within TRNCO. And then, finally, let me address the counsel's point with respect to the fact that the wholesale price is greater than the retail price. I think that the complaint doesn't give us enough to know whether that's an apples-to-apples comparison, because there are promotional pricing and things like that that happen at the retail level that don't necessarily happen at wholesale. I'll tell you the truth, counsel. To me, this is a judgment motion for judgment on the pleadings, and there are some facts that I think probably do need to be developed to see whether — I mean, I understand their theory, and their theory is not controlled by TRNCO when you're looking at it in terms of the combination of activities at both the wholesale and the retail level. But there are some facts that seem to need development in this case. Well, let — on that, Your Honor, let me — let me point out that although I don't think the complaint gives us really enough to know whether they're drawing the relevant comparisons, let's — the Court can assume for purposes of its decision that this was an apples-to-apples price comparison, that the wholesale price was indeed greater than the retail price. The reason that is irrelevant as a matter of law and why there's no factual development that needs to be had on that is that the wholesale price is a different product from the retail product. And TRNCO establishes that where the wholesale product is brought out, it's not — you're not in the business of selling that to the public. It's brought out only by compulsion of statute. It's a different product in a narrow sense, but it's — when you look at it, it's the provision of DSL services. It's really one big product. You can — you can separate it out that way, but it is, in the end, whether or not I'm going to get DSL in my home as opposed to cable. Yeah. I think there are differences. But again, for purposes — I understand we're on a motion to dismiss. TRNCO, by the way, was on a motion to dismiss as well. This is judgment on the pleadings. Correct, Your Honor. I guess my point was the standard is the same in terms of taking the pleadings as true. And TRNCO was, again, taking the pleadings as true there. The — in TRNCO, the allegation was that the defendants had refused to provide network elements for the purpose of excluding the plaintiffs from the market. There was an avowed anti-competitive intent. And the Court held, notwithstanding those allegations of anti-competitive intent, that no liability was proper. Their argument that we're charging them more — and my point, again, is that it's for a different product, but putting that aside — that we're charging them more than we charge others, at best would go to the — to an argument that it was — might have been profitable for us to sell to them, that, therefore, our refusal to do that is evidence of an anti-competitive intent. That is precisely the allegation that TRNCO says is irrelevant and doesn't support antitrust liability in the — in the context of compelled dealings and a defendant who's not otherwise in the business of selling in the market. And that context is precisely the context that we have here. Thank you, Your Honor. Dr. Gould, any questions? I have no questions. All right. Thank you, counsel. Thank you both for your arguments and briefing. It was excellent.
judges: Thomas, Wardlaw, Gould